# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

William H. Ball,

      Plaintiff

v.

Citibank, N.A.,

      Defendant

Case No.: 2:24-cv-00222-JAD-EJY

**Order Granting Motion to Compel and Closing Case**

[ECF Nos. 4, 5]

Pro se plaintiff William H. Ball sues Citibank, N.A., alleging that it violated the Fair Credit Reporting Act (FCRA) by telling credit bureaus that he was an authorized user on an account that belonged to his wife.[1]  Ball concedes that his wife Michele[2] did, in fact, make him an authorized user on her account but alleges that it was improper for Citibank to report this because he wasn't required to pay the account's balance and, therefore, it shouldn't impact his credit.[3]  Citibank now moves to compel arbitration, arguing that Michele's credit-card contract had an arbitration agreement that binds authorized-user Ball to arbitrate this dispute.[4]  Ball counters that he shouldn't be held to his wife's contract with Citibank because he never signed it, the agreement is unfair, and his statutory claim falls outside the agreement's scope.  But I find that Ball is bound to the arbitration agreement, the agreement isn't unconscionable, and Ball's claim falls within its sweep.  So I grant the motion to compel and dismiss this case without prejudice.

---

[1] ECF No. 1-1 at 2 (complaint).

[2] Because Michele shares a last name with the plaintiff, I refer to her by her first name for clarity's sake.  No disrespect is intended by doing so.

[3] ECF No. 1-1

[4] ECF No. 4.

**Background**

In September 2014, Citibank issued Michele a Sears MasterCard credit card, and Michele added Ball as an authorized user that same month.[5]  Citibank then issued Ball his own card in his name.[6]  Citibank contends—and Ball doesn't deny—that he used this card for years.[7]  Ball alleges that in 2023 he attempted to purchase a home and, during the loan-application process, he was surprised to learn that his credit report contained "negative information" in it concerning him "being an authorized user on accounts for which [he] had never agreed to pay."[8]  According to Ball, he was told that this "negative information" caused his credit score to be "too low" for the mortgage company he was dealing with to grant him a loan, and he was forced to rent an apartment instead.[9]  He brought this FCRA action because he was "damaged by the misleading information" that Citibank included "in its reports to credit reporting agencies" that he "was responsible for accounts for which [he] had no legal responsibility to pay."[10]

**Discussion**

**A.     Citibank can enforce the arbitration agreement against Ball.**

Ball argues that Citibank can't force him to arbitrate this FCRA[11] claim because he wasn't a party to the arbitration agreement between it and Michele.[12]  Ball highlights that he "did not sign any agreement" regarding Michele's account and never consented to "be held to any

---

[5] ECF No. 4-1 at ¶ 4; *see also* ECF No. 4-2; ECF No. 4-3.

[6] ECF No. 4-1 at ¶ 4.

[7] ECF No. 10 at 6.

[8] ECF No. 1-1 at ¶¶ 2–3.

[9] *Id.* at ¶¶ 7–8, 14–15.

[10] *Id.* at ¶¶ 16–17.

[11] ECF No. 8 at 2.

[12] *Id.* at 1.

2

provisions of Michele's agreement with" Citibank.[13]  Citibank contends that Ball must arbitrate

his FCRA claim because it derives from his authorized-user status and that, as an authorized

user, he is bound to Michele's contract and the arbitration clause contained therein[14] under

general agency and equitable-estoppel principles as well as South Dakota statutory law.[15]

> ### 1.    Ball is bound to the arbitration agreement under either Nevada or South Dakota law.

The parties disagree over whether the South Dakota or Nevada law should apply.

Citibank points to the South Dakota choice-of-law provision in Michele's contract and cites

authority on how courts should generally enforce such clauses.[16]  But the preliminary inquiry

here is whether Ball is even bound to the contract that adopts South Dakota law.  And "whether a

choice-of-law provision applies depends on whether the parties agreed to be bound by the

contract in which it appears."[17]  Courts tasked with first determining whether parties actually

agreed to be bound to a contract with a choice-of-law provision have conducted traditional

choice-of-law analyses to determine what law should be used to answer that threshold question.[18]

But the result is the same under both South Dakota and Nevada law, as explained *infra*, so I need

---

[13] *Id.*

[14] ECF No. 4 at 2–5. Citibank separately filed a motion to compel arbitration, *id.*, and a motion to dismiss, as this district's local rules require.  ECF No. 5.  The briefing for both is identical so I cite exclusively to the motion-to-compel briefing.  ECF Nos. 4, 10.

[15] ECF No. 10 at 3–6.

[16] ECF No. 4 at 6; ECF No. 10 at 2.

[17] *In re Henson*, 869 F.3d 1052, 1059 (9th Cir. 2017) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014)).

[18] *See, e.g., Heiges v. JP Morgan Chase Bank, N.A.*, 521 F. Supp. 2d 641, 646 (N.D. Ohio 2007) (collecting cases).

1 not determine which should be used to assess whether Ball is bound to the arbitration

2 agreement.[19]

3      ## 2.   *Agency principles bind Ball to the agreement under Nevada law.*

4      Ball contends that he can't be forced to arbitrate because he "did not sign any agreement"

5 related to Michele's account.[20]  Citibank argues that Ball is Michele's agent and "[a]gency binds

6 him to the agreement,"[21]  citing *Truck Insurance Exchange v. Palmer J. Swanson, Inc.*[22] for the

7 proposition that state-law contract principles "can bind a non-signatory to an arbitration

8 agreement."[23]  In *Truck Insurance Exchange*, the Nevada Supreme Court recognized that "a

9 nonsignatory may be bound to an arbitration agreement if so dictated by the ordinary principles

10 of contract and agency."[24]  More specifically, it acknowledged five "theories for binding

---

12 [19] *See In re Coast Trading Co., Inc.*, 744 F.2d 686, 689 (9th Cir. 1984) ("As we could reach the
13 same result under the law of any of the four states mentioned, we need not resolve a choice of
law issue."); *Nguyen v. Barnes & Noble, Inc.*, 2012 WL 3711081, at *3 (C.D. Cal. Aug. 28,
14 2012), *aff'd*, 763 F.3d 1171 (9th Cir. 2014) (noting that whether to apply the New York law
(from the choice-of-law clause) to assess the arbitration clause's validity was a "'chicken and
15 egg' question" because it hadn't been established that the plaintiff had agreed to the contract, but
proceeding because whether the plaintiff had "assented to the Terms of Use, and, consequently,
16 the validity of the arbitration provision, d[id] not hinge on whether New York or California law
applie[d]").

17 [20] ECF No. 8 at 1.

18 [21] ECF No. 10 at 3–4.  Citibank also argues that it can enforce the arbitration agreement under
equitable-estoppel principles, *see id.* at 4–5, but I need not and thus do not reach the validity of
19 this theory.  *See Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 189 P.3d 656, 661 (Nev. 2008)
(cleaned up) ("A nonsignatory is estopped from refusing to comply with an arbitration clause
20 when it receives a direct benefit from a contract containing an arbitration clause." (quoting *Inter.
Paper v. Schwabedissen Maschinen & Anlagen*, 206 F.3d 411, 418 (4th Cir. 2000))).  *But see El
21 Jen Med. Hosp., Inc. v. Tyler*, 535 P.3d 660, 670 (Nev. 2023) (clarifying that the estoppel
doctrine only applies if the nonsignatory's *claim* seeks to derive a benefit from the at-issue
22 contract (quoting *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 741 (Tex. 2005))).

[22] *Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 189 P.3d 656 (Nev. 2008).

23 [23] ECF No. 10 at 3.

[24] *Truck Ins. Exchange*, 190 P.3d at 634–35.

4

nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ago; and (5) estoppel."[25]

Ball concedes his authorized-user status,[26] and the at-issue contract states that all authorized users are the account holder's agents and that the account holder "must pay . . . for all charges made by authorized users."[27]  Michele requested a separate card for Ball under those circumstances and he decided to use that card, knowing it was linked to her account and that she would be responsible for covering any charges.[28]  These actions are sufficient to establish a principal-agent relationship related to Ball's credit-card usage.[29]

But the mere fact that Ball was Michele's agent isn't enough to get the job done here because an agent isn't traditionally bound to his principal's contracts; it's the other way around. A court facing a similar attempt to compel an agent to arbitrate under an agreement that the principal entered into observed that one of the only ways an agent can be so bound[30] "is if she is made a party to the contract by her principal acting on her behalf with actual, implied, or

---

[25] *Id.* (cleaned up).  The Nevada Supreme Court recently confirmed that "a nonsignatory to an arbitration agreement can be obligated to arbitrate if one of the five theories is satisfied."  *RUAG Ammotec GmbH v. Archon Firearms, Inc.*, 538 P.3d 428, 434 (Nev. 2023).

[26] ECF No. 8 at 1.

[27] ECF No. 4-4 at 4.

[28] *Id.*; ECF No. 8 at 1.

[29] *See* Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006) (an agency relationship arises when a principal "manifests assent to" an agent "that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act").  Nevada courts often rely on the Restatement for general agency principles.  *See, e.g., Deutsche Bank Nat'l Tr. Co. for WaMu Mortg. Pass-Through Certificates, Series 2005-AR11 v. Saticoy Bay, LLC Series 11358 Cedar Log*, 422 P.3d 1231 (Nev. 2018) (table decision) (citing to multiple sections of the Restatement (Third)); *Dezzani v. Kern & Assocs., Ltd.*, 412 P.3d 56, 61 (2018) (same).

[30] One of the other rare circumstances in which an agent would be so bound is when he signs a contract on behalf of an undisclosed principal.  Restatement (Third) of Agency § 6.03 (Am. L. Inst. 2006).  But that, of course, didn't happen here.

apparent authority."[31]  And under this approach, Michele did indeed have, at minimum, apparent authority to bind Ball to the contract.

In Nevada, authority is apparent when one person permits another "to exercise or to represent himself as possessing, under such circumstances as to estop the [former] from denying its existence."[32]  So Ball could be bound to the agreement under an apparent-authority theory if Citibank "reasonably relied on [Michele]'s acts, and . . . [Ball] knew of and acquiesced to those acts."[33]  Citibank relied on Michele's request to add Ball to her account, believing that she had the authority to bind him as an authorized user.[34]  And Ball's subsequent, years-long use of the card demonstrates that he knew that Michele had added him to her account as an authorized user and acquiesced to her doing so.[35]  So Ball is bound to the arbitration agreement under Nevada agency principles.

### 3.   *Ball's credit-card usage binds him to the agreement under South Dakota law, too.*

Citibank argues that, under South Dakota law, "Ball agreed to be bound to the [arbitration] agreement by using his credit card."[36]  In South Dakota, "use of an accepted credit card . . . creates a binding contract between the card holder and card issuer with reference to any accepted credit card."[37]  And an "accepted credit card" includes "any credit card . . . which the

---

[31] *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 445 (3d Cir. 1999).

[32] *Simmons Self-Storage v. Rib Roof, Inc.*, 331 P.3d 850, 857 (Nev. 2014) (citing *Dixon v. Thatcher*, 742 P.2d 1029, 1031 (1987)) (cleaned up).

[33] *Id.*

[34] *See* ECF No. 4-1 at ¶¶ 4, 10; ECF No. 4-3 at 2, 3; ECF No. 4-4 at 4, 7.

[35] ECF No. 4-1 at ¶ 4; ECF No. 10 at 6.

[36] ECF No. 10 at 6.

[37] S.D. Codified Laws § 54-11-9.

6

cardholder . . . has signed or has used."[38]  In essence, just using a credit card amounts to acceptance of that card's contract in South Dakota.[39]  Ball concedes that he was an authorized user on Michele's account[40] and doesn't dispute that he had his own credit card in his own name.[41]  And this part of the statute doesn't apply solely to primary card holders or account holders.[42]  So Ball is bound to the contract as an authorized user under South Dakota law, too.

**B.     Citibank can enforce the arbitration agreement against Ball.**

> **1.     *Challenges to the validity or scope of an arbitration agreement can be decided by the court.***

The Federal Arbitration Act (FAA) states that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy" arising out of the contract or transaction "shall be valid, irrevocable, and enforceable save upon grounds as exist at law or in equity for the revocation of any contract."[43]  It permits any party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to petition any federal district court for an order compelling arbitration in the manner

---

[38] *Id.* at § 54-11-1.

[39] *Hartranft v. Encore Cap. Grp., Inc.*, 543 F. Supp. 3d 893, 919 (S.D. Cal. 2021) (quoting S.D. Codified Laws § 54-11-9); *see also Ranginwala v. Citibank, N.A.*, 2020 WL 6817508, at *4 (D.N.J. Nov. 19, 2020) ("Plaintiff having taken no action to reject the arbitration provision and proceeding to use the account is sufficient to establish Plaintiff's assent to the Agreement."); *Batty v. Experian Info. Sols., Inc.*, 2020 WL 10817762, at *1 (N.D. Tex. Oct. 7, 2020) ("Plaintiff used the card, demonstrating her acceptance.").

[40] ECF No. 8 at 1; *see also* ECF No. 4-1 at ¶ 4 (according to Citibank, Ball became an authorized user "on or about September 13, 2014").

[41] *See* ECF No. 4-1 at ¶ 4 (averring that Citibank "issued a credit card to Mr. Ball as an authorized user, in his own name, after [Michele] added him as an authorized user").

[42] *Compare* S.D. Codified Laws § 54-11-9 (referencing "charges made with the authorization of the primary card holder") *with id.* (not using the term "primary" to modify "card holder" when discussing being bound by using a credit card).

[43] 9 U.S.C. § 2.

provided for in the arbitration agreement.[44]  The FAA "establishes a federal policy favoring
arbitration, requiring that [courts] rigorously enforce agreements to arbitrate,"[45] and it provides
"that [if a] contract contains an arbitration clause, there is a presumption of arbitrability."[46]  "By
its terms, the Act 'leaves no place for the exercise of discretion by a district court, but instead
mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which
an arbitration agreement has been signed.'"[47]  The district court's role under the FAA is
therefore "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does,
(2) whether the agreement encompasses the dispute at issue."[48]  While challenges to the validity
of a contract as a whole must be decided by the arbitrator, challenges to the validity of the
arbitration clause itself can be resolved by the court.[49]

> ### 2.    *A valid arbitration agreement exists.*

> #### i.    *South Dakota law applies to the unconscionability inquiry.*

Ball highlights that South Dakota law was "chosen by [Citibank] in its unfair contract"
and that neither he nor Michele have ever "been in the state of South Dakota."[50]  While he
doesn't explicitly state as much, Ball appears to believe that the law of his home state, Nevada,

---

[44] *Id.* at § 4.

[45] *Shearson/Am. Exp. Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (cleaned up).

[46] *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1284 (9th Cir. 2009) (internal quotation marks omitted) (quoting *AT&T Techs, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).

[47] *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting *Dean v. Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

[48] *Id.*

[49] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006).

[50] ECF No. 8 at 1.

1  should apply rather than that of South Dakota.  Citibank argues that courts generally honor

2  choice-of-law clauses, and that while there are two exceptions to that rule, neither applies here.[51]

3          Both Nevada and federal common law choice-of-law rules follow the Restatement

4  (Second) of Conflict of Laws.[52]  It establishes that courts should enforce contractual choice-of-

5  law provisions "unless 'the chosen state has no substantial relationship to the parties or the

6  transaction and there is no other reasonable basis for the parties' choice'" or, alternatively,

7  "application of the law of the chosen state would be contrary to a fundamental policy of a state

8  [that] has a materially greater interest than the chosen state in the determination of the particular

9  issue," so long as "that state would be the state of applicable law in the absence of a choice-of-

10 law clause."[53]  Citibank's headquarters is in South Dakota, and it is from there that the credit in

11 the at-issue account extends, so South Dakota has a substantial relationship to the parties in this

12 dispute.[54]  And neither party has identified (nor is this court aware of) any fundamental Nevada

13 policy that would be contravened by finding that this arbitration agreement is governed by South

14 Dakota law or by applying South Dakota's unconscionability test.[55]  So the South Dakota

15 choice-of-law provision applies.

---

[51] ECF No. 4 at 6.

[52] *See Progressive Gulf Ins. Co. v. Faehnrich,* 327 P.3d 1061, 1063–64 (Nev. 2014) (collecting cases); *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir. 1997); *In re Sterba*, 852 F.3d 1175, 1179 (9th Cir. 2017) ("Federal choice-of-law rules in the Ninth Circuit follow the Restatement (Second) of Conflict of Laws . . . .") (citation omitted); *see also Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991) (noting "that a federal court sitting in diversity applies the conflict-of-law rules of the state in which it sits" (quoting *Harris v. Polskie Linie Lotnicze*, 820 F.2d 1000, 1002 (9th Cir. 1987))); *Chan*, 123 F.3d at 1297 ("Federal common law applies to choice-of-law determinations in cases based on federal question jurisdiction . . . ." (citing *Schoenberg*, 930 F.3d at 782)).

[53] *Chan*, 123 F.3d at 1297 (quoting Restatement (Second) of Conflict of Laws § 187(2) (1971)).

[54] *See Lomeli v. Midland Funding, LLC*, 2019 WL 4695279, at *8 (N.D. Cal. Sept. 26, 2019).

[55] Both states' tests are similar and have procedural and substantive components.  *Compare D.R. Horton, Inc. v. Green*, 96 P.3d 1159, 1162 (Nev. 2004), *overruled on other grounds by U.S.*

1    **ii.       *The arbitration agreement isn't procedurally unconscionable.***

2        "Unconscionability under South Dakota law has both 'procedural' and 'substantive'

3    components."[56]  Procedural unconscionability focuses on "how the contract was made."[57]

4    Courts consider factors such as "whether there was a meaningful choice"[58] and "whether the

5    provision in question was written in fine print or technical jargon."[59]  Ball contends that the

6    arbitration agreement is "unfair" because the arbitration provisions "were hidden" and the only

7    choice was to either accept them "or not do business with [Citibank]."[60]  Citibank counters that

8    the arbitration agreement was highlighted rather than hidden,[61] and Ball and Michele weren't

9    forced to accept the arbitration agreement because it expressly gave them the ability to opt out of

10   it.[62]

11       Neither of Ball's procedural-unconscionability arguments is sound.  First, the arbitration

12   agreement is the most pronounced portion of the contract, not "hidden" as Ball claims.[63]  Unlike

13   other sections, the section header "**ARBITRATION**" is bolded and capitalized.[64]  The section is

14   graphically set off from the other portions of the contract with separating lines.[65]  The first

15   ─────────────────────

16   *Home Corp. v. Michael Ballesteros Tr.*, 415 P.3d 32 (Nev. 2018) *with Nygaard v. Sioux Valley Hosps. & Health Sys.*, 731 N.W.2d 184, 194 (S.D. 2007).

17   [56] *Giddings v. Media Lodge, Inc.*, 320 F. Supp. 3d 1064, 1072 (D.S.D. 2018) (citing *Nygaard*, 731 N.W.2d at 194–95; *Johnson v. John Deere Co.*, 306 N.W.2d 231, 237 (S.D. 1981).

18   [57] *Nygaard*, 731 N.W.2d at 195.

19   [58]*Id.*

     [59] *Giddings*, 320 F. Supp. 3d at 1072 (collecting cases).

20   [60] ECF No. 8 at 2.

21   [61] ECF No. 10 at 6–9.

     [62] *Id.*

22   [63] ECF No. 4-4 at 7.

23   [64] *Id.*

     [65] *Id.* at 7–8.

paragraph in that section, unlike any other text in the contract, is bolded and capitalized as well.[66]  Above that paragraph, a bolded, capitalized, and italicized sentence advises the card holder to "***READ THIS PROVISION OF THE AGREEMENT CAREFULLY***."[67]  And the section doesn't use a smaller font size or "fine print."[68]

The contract also provides a meaningful choice because card holders had an opportunity to opt out of the arbitration agreement[69] and weren't, as Ball contends, forced to either accept the terms "or not do business" with Citibank.[70]  The first page of the letter that precedes the current contract contains an all-bold paragraph establishing that a card holder has "the right to reject the change to arbitration"[71] and that doing so will mean the account is "no longer subject to an arbitration provision."[72]  It goes on to provide the specific procedures for opting out of the arbitration agreement.[73]  And the second page of the letter similarly details how to "reject the arbitration provision" under a "Right to Opt Out" heading.[74]  So Ball hasn't established that the arbitration agreement is procedurally unconscionable.

---

[66] *Id.* at 7.

[67] *Id.*

[68] *Id.* at 7–8.

[69] *Garcia v. Citibank, N.A.*, 2019 WL 2902499, at *4 (C.D. Cal. Feb. 13, 2019).

[70] ECF No. 8 at 2.

[71] ECF No. 4-4 at 2 (emphasis removed).

[72] *Id.* (emphasis removed).

[73] *Id.*

[74] *Id.* at 3.

11

### iii.    *The arbitration agreement isn't substantively unconscionable.*

Nor can I conclude that the arbitration agreement is substantively unconscionable. A substantive-unconscionability inquiry looks at whether the agreement contains "overly harsh or one-sided terms."[75] Ball notes that he could seek punitive damages under FCRA but not under contract and suggests that this is a reason why "[t]his matter should kept in this court."[76] But even assuming that a punitive-damages waiver could support an unconscionability argument, the arbitration agreement at issue here contains no such waiver.[77] Nothing in the agreement states that by arbitrating his FCRA claim, Ball will forego particular FCRA remedies.

Ball also takes issue with the fact that arbitration involves giving "up a constitutional right to trial by jury," but that is just the nature of arbitration. The arbitration agreement is bilateral in that any party can initiate arbitration proceedings for "any claim, dispute, or controversy."[78] While it does contain a class-action waiver, that doesn't render it overly harsh or one-sided such that it is substantively unconscionable.[79] And courts have regularly found that similar if not identical Citibank arbitration agreements aren't unconscionable.[80] So Ball hasn't shown substantive unconscionability either.

---

[75] *Nygaard*, 731 N.W.2d at 195.

[76] ECF No. 8 at 2.

[77] ECF No. 4-4 at 7–8.

[78] *Id.* at 7 (cleaned up).

[79] *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011).

[80] *See Hartranft*, 543 F. Supp. 3d at 918 (collecting cases).

### 3.    The arbitration agreement encompasses Ball's dispute with Citibank.

Ball seems to believe that, because he brings an FCRA claim rather than a contract claim, his cause of action isn't subject to the arbitration agreement.[81]  Citibank counters that Ball's inaccurate-credit-reporting claim "falls squarely under the arbitration clause."[82]  The arbitration agreement covers claims, disputes, or controversies "arising out of or related to" the at-issue account.[83]  It notes that "all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy . . . they seek, including Claims based on . . . statutory and regulatory provisions."[84]  And this includes "Claims made by or against anyone connected with [Michele] or [Citibank] . . . such as a co-applicant, authorized user, employee, agent, representative, or an affiliated/parent/subsidiary company."[85]

Ball's FCRA claim is based in statute, not contract, but the arbitration agreement expressly covers statutory claims.[86]  His claim relates to the account as it is based on Citibank reporting the account to credit agencies,[87] something that the contract gives Citibank the authority to do.[88]  And the arbitration agreement specifically states that claims brought against it by authorized users like Ball are subject to arbitration.  So Ball's dispute with Citibank plainly falls within the scope of the arbitration agreement.

---

[81] ECF No. 8 at 2.

[82] ECF No. 4 at 8.

[83] ECF No. 4-4 at 7.

[84] *Id.*

[85] *Id.* (cleaned up).

[86] *Id.*

[87] ECF No. 1-1.

[88] ECF No. 4-4 at 5 ("We may report account information in your name and the names of authorized users.").

The arbitration agreement is therefore binding on, and enforceable against, Ball, and it obligates him to arbitrate this FCRA claim.  So I grant Citibank's motion to compel arbitration.

## C.     Dismissal is warranted.

Having found that Ball's claim must be arbitrated, I can either stay this case pending arbitration or dismiss it without prejudice.[89]  Citibank moves to dismiss this case[90] and Ball doesn't directly address this issue.[91]  Because I find that Ball's only claim falls within the arbitration agreement's scope, I dismiss this case without prejudice and order the parties to arbitrate in accordance with the agreement.

### Conclusion

IT IS THEREFORE ORDERED that Citibank's **motion to compel arbitration [ECF No. 4] and motion to dismiss [ECF No. 5] are GRANTED**.  The parties are ordered to arbitrate Ball's claim in compliance with the arbitration agreement, and this case is **DISMISSED without prejudice**.

**The Clerk of Court is directed to CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
May 9, 2024

---

[89] *Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 638 (9th Cir. 1988).

[90] ECF No. 4 at 8.

[91] ECF No. 8.

14